IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ISMAEL ROMAN | : | CIVIL ACTION |
| AS ADMINISTRATOR OF THE | : | |
| ESTATE OF NAYELIS RUIZ | : | |
| ROMAN, a/k/a NAYELIS RUIZ, | : | |
| DECEASED, et al., | : | |
| Plaintiffs | : | |
| | : | |
| vs. | : | NO.  11-1156 |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| Defendant | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                                                                            **December  5, 2013**

This is a medical malpractice action filed against the United States under the Federal Tort Claims Act.[1]  Yadira Roman, the plaintiff, contends that two physicians employed by Southeast Lancaster Health Services were negligent in managing her labor and delivery on February 16, 2008.  Southeast Lancaster Health Services is a federally funded community health clinic and its employees are considered to be federal employees.  Evidence was presented during a bench trial beginning on November 4, 2013.  The following findings of fact and conclusions of law are based upon the evidence presented and the arguments advanced by counsel.

**FINDINGS OF FACT**

1.      Southeast Lancaster Health Services provides medical and dental care to economically disadvantaged members of the Lancaster, Pennsylvania community.

---

[1] Title 28 of the United States Code, Section 1346(b).

Southeast Lancaster Health Services operates a clinic at 625 South Duke Street, Lancaster, Pennsylvania.

2. Southeast Lancaster Health Services receives federal funding for its work in the Lancaster community. The medical staff, as well as the support staff, are federal employees for purposes of this case.

3. Yadira Roman was a patient of Southeast Lancaster Health Services and received medical care in 2007 and 2008 for her pregnancy from Rachel Eash-Scott, M.D., a member of the Southeast Lancaster Health Services medical staff.

4. On January 4, 2008, Yadira Roman was seen at Southeast Lancaster Health Services by a nurse practitioner for her thirty-three week pre-natal visit. Ms. Roman complained of headaches and occasional blurred vision.

5. On February 15, 2008, Yadira Roman was seen and referred by Dr. Eash-Scott to the triage unit at Lancaster General Women and Babies Hospital for PIH evaluation for increased swelling, blood pressure of 148 over 80, and +2 proteinuria.

6. Ms. Roman was admitted to the hospital that evening for induction of labor. Dr. Eash-Scott prescribed Cervicil, a medication used to soften the cervix and encourage labor.

7. After her evaluation of Yadira Roman on February 15, 2008, Dr. Eash-Scott noted certain symptoms of preeclampsia, but did not diagnose preeclampsia.

8. Upon admission to the hospital on February 15, 2008, Yadira Roman denied any signs or symptoms of preeclampsia, specifically no headaches, visual changes, or right upper quadrant abdominal pain.

9.      At or about 6:50 a.m. on February 16, 2008, Dr. Eash-Scott examined Yadira Roman and determined that she was two centimeters dilated, 100% effaced, with the fetal head at -1 station.

10.     On the morning of February 16, 2008, Dr. Eash-Scott transferred care of Yadira Roman to Kirsten Johnsen-Martin, D.O., a board certified family practice physician at Southeast Lancaster Health Services.  Dr. Johnsen-Martin had privileges at Lancaster General Women and Babies Hospital to manage labor and delivery.  Dr. Johnsen-Martin did not have hospital staff privileges to perform a vacuum assisted delivery or a caesarean section.

11.     At or about 8:25 a.m. on February 16, 2008, Dr. Johnsen-Martin examined Yadira Roman and determined that she was two to three centimeters dilated, 100% effaced and at 0 to +1 station.

12.     Dr. Johnsen-Martin then ordered that Nubain be administered to Yadira Roman for pain relief.

13.     At 10:33 a.m. on February 16, 2008, Yadira Roman's membranes spontaneously ruptured.

14.     At or about 11:42 a.m. on February 16, 2008, Dr. Johnsen-Martin performed a cervical exam and noted that Yadira Roman's cervix was four centimeters dilated and 100% effaced.

15.     Dr. Johnsen-Martin then ordered the administration of Pitocin to induce labor.

16.     On February 16, 2008, Dr. Johnsen-Martin was aware that Yadira Roman's blood pressure fluctuated from mid-140's or below (systolic), over 80 or below (diastolic) throughout the day.

17.     Dr. Johnsen-Martin never diagnosed Yadira Roman with preeclampsia. In fact, Ms. Roman did not have preeclampsia.

18.     During her labor, Ms. Roman was attached to a fetal heart monitor. Dr. Johnsen-Martin followed the fetal heart tracings closely during Ms. Roman's labor.

19.     At approximately 5:15 p.m. on February 16, 2008, the baby was at +1 -- +2 station.

20.     At approximately 6:30 p.m., Ms. Roman was fully dilated and started pushing.

21.     From 6:30 p.m. until approximately 9:08 p.m., Ms. Roman "pushed," a term used to described the process of the mother exerting force through her abdominal and pelvic muscles to force the baby through the birth canal.

22.     Despite her great efforts, with appropriate direction from Dr. Johnsen-Martin and the nurses, Ms. Roman was unable to deliver her baby during that time and she expressed to her doctor that she was exhausted.

23.     Dr. Johnsen-Martin is fluent in Spanish and was able to communicate with Ms. Roman who spoke only Spanish.

24.     Dr. Johnsen-Martin requested an obstetrical consult with Daniel Weber, M.D., the attending obstetrician on call at the time. The request for the consult was made at 9:08 p.m. Dr. Weber was close by and responded within minutes.

25. When Dr. Weber entered the patient's room, he found that the fetal heart tones were approximately 165 with moderate beat to beat variability during the immediately prior twenty to thirty minutes.

26. Dr. Weber is a board certified obstetrician/gynecologist and is an attending physician at Women and Babies Hospital. He also serves as an instructor in the Lancaster General Hospital Family Medicine residency program.

27. Dr. Weber performed an examination of Yadira Roman and reviewed approximately one-half hour of fetal tracings. He found the fetal heart rate to be approximately 165 with moderate variability.

28. Dr. Weber accurately assessed the pelvis as adequate and weight of the baby as under eight pounds.

29. The size of the baby did not indicate any increased risk that a shoulder dystocia would occur during delivery.

30. Dr. Johnsen-Martin did not have the authority to instruct Dr. Weber to perform a vacuum assisted delivery or caesarean section, or any authority to mandate what Dr. Weber did to deliver the baby.

31. Dr. Weber recommended to the patient that he perform a vacuum assisted vaginal delivery, and the patient consented. After Dr. Weber delivered the baby's head by a vacuum assist, he diagnosed a shoulder dystocia, which means the baby's shoulder was lodged behind the mother's pubic bone and impeding the baby's delivery from the birth canal.

32. The shoulder dystocia that occurred in this case was addressed by Dr. Weber performing appropriate maneuvers to relieve it and deliver the baby.

33. These maneuvers were unsuccessful until four and a half minutes had passed, at which time the baby was delivered vaginally with a double nuchal cord which had been reduced during the course of delivery.

34. Shoulder dystocia cannot be predicted by a doctor, and it cannot be caused by a doctor. Shoulder dystocia occurs in approximately 2% of vaginal deliveries, and is relieved without hypoxic injury to the baby in the vast majority of those cases. A double nuchal cord could not have been confirmed or predicted by the physicians before delivery.

35. At 9:40 p.m. on February 16, 2008, baby Nayelis Ruiz Roman was delivered vaginally, and had APGAR scores of 0 at five minutes, and 0 at ten minutes, and 0 at fifteen minutes after birth.

36. The blood gas of baby Nayelis Ruiz Roman drawn at 9:50 p.m. showed a pH of 6.96 with a pC02 of 227 and a p02 of 9. Blood gas findings of a pH of 6.96 with a pC02 of 227 and a p02 of 9 would indicate metabolic acidosis and hypoxemia.

37. During Yadira Roman's labor, the fetal heart tracings showed accelerations and decelerations.

38. As she was pushing during her contractions, there were decelerations in the fetal heart rates. This is a normal fetal response to the stress of the mother pushing and did not signal any fetal distress.

39.     The fetal heart rate consistently returned to a normal baseline after the accelerations and decelerations.

40.     For brief periods of time during Yadira Roman's labor, her baby's heart rate accelerated into a range above the normal baseline. Richard L. Luciani, M.D., a board certified obstetrician/gynecologist who testified as the plaintiffs' expert, offered his opinion that the period of elevated fetal heart rates indicated the baby's heart rate was in "tachycardia," which would have been evidence of fetal distress. Jay Goldberg, M.D., a board certified obstetrician/gynecologist who testified as the defendant's expert witness, offered his opinion that the baby was not in tachycardia, but rather was experiencing accelerations, which were expected to occur and which were normal. The medical expert witnesses disagreed on whether the baby was in tachycardia.

41.     Tachycardia occurs when the fetal heart rate increases at a sustained and consistent rate substantially above the baseline such that a new baseline, at the higher level, is created. The accelerations in the baby's heart rate were not sufficiently prolonged to support a conclusion that the baby was in tachycardia on February 16, 2008. Dr. Goldberg testified credibly that the fetal strips were indications of a pattern of accelerations and decelerations with moderate variability as opposed to tachycardia.

42.     Dr. Goldberg testified credibly that the baby's heart rate during the labor and delivery process did not indicate the baby was in tachycardia.

43.     Dr. Goldberg testified credibly that the fetal heart tracings, considered in the context of the clinical observations and evaluations of Dr. Johnsen-Martin, were reassuring. This opinion is well-supported by the evidence. Dr. Goldberg's opinion

7

supports the assessment made by Dr. Johnsen-Martin at the time, that the fetal heart tracings considered together with the clinical observations were not showing fetal distress and were reassuring to the medical staff.

44. Dr. Johnsen-Martin removed the toco monitor from Ms. Roman at 7:40 p.m. The toco monitor measures the mother's contractions during labor. Without the toco monitor, the fetal heart tracings do not indicate if the decelerations were late or variable. Dr. Johnsen-Martin testified credibly that she was able to manage Ms. Roman's labor effectively without the toco monitor by observing the ongoing recorded activity from the fetal heart monitor and by her clinical assessment of the status of Ms. Roman's contractions.

45. Almost immediately after her birth, baby Nayelis Ruiz Roman was taken to the NICU in very grave condition. She was experiencing seizures and appeared to suffer from serious neurological deficits.

46. The blood gas findings and the clinical picture indicated that baby Nayelis experienced oxygen loss during delivery.

47. Plaintiffs Yadira Roman and Carlos Ruiz contend that Dr. Johnsen-Martin was negligent for failing to summon Dr. Weber for a consult before 9:08 p.m. on February 16, 2008, and for failing to direct Dr. Weber, or recommend to Dr. Weber, that he perform a caesarian section delivery.

48. Dr. Richard L. Luciani, the plaintiffs' expert witness, testified that Dr. Johnsen-Martin should have "ordered" a caesarian section delivery at around 7:30 p.m. on the basis of the fetal heart tracings.

49.     Dr. Johnsen-Martin did not have the authority to order Dr. Weber, or any other attending obstetrician, to perform a caesarian section delivery.

50.     There is no evidence that a recommendation from Dr. Johnsen-Martin to Dr. Weber, or any other attending obstetrician, would have resulted in a caesarian section delivery being performed at 7:30 p.m., or any other time that evening.

51.     There is no evidence to support a conclusion that a caesarean section delivery should have been performed at 7:30 p.m., after Ms. Roman was pushing for approximately ninety minutes.

## CONCLUSIONS OF LAW

1.      Under the Federally Supported Health Centers Assistance Act, the Secretary of Health and Human Services may deem certain health centers and their employees to be employees of the Public Health Service. 42 U.S.C. § 233(g). Once the health center and its employees have been deemed federal employees by the Secretary of Health and Human Services and they are found to be acting within the scope of their employment, the sole remedy for any alleged claim of malpractice is against the United States under the Federal Tort Claims Act. 42 U.S.C. § 233(a).

2.      Southeast Lancaster Health Services was deemed eligible for medical malpractice coverage under the Federal Tort Claims Act by the Secretary of Health and Human Services on the dates of the events that give rise to this action. Dr. Rachel Eash-Scott and Dr. Kirsten Johnsen-Martin were employees of Southeast Lancaster Health Services, and because they were certified to be acting within the scope of their employment on those dates, the only claim in this action against Southeast Lancaster

9

Health Services, Dr. Eash-Scott, and Dr. Johnsen Martin is a claim against the United States.

3. Suits under the FTCA are governed by state law. 28 U.S.C. § 1346(b); Santos ex rel. Beato v. U.S., 559 F.3d 189, 193 (3d Cir. 2009). The alleged acts and omissions occurred in Lancaster County, Pennsylvania; accordingly, Pennsylvania law applies in this case.

4. To prevail in a medical malpractice action under Pennsylvania law, the plaintiff must establish (1) a duty owed by the physician to the patient, (2) a breach of that duty, (3) that the breach was the proximate cause of the hard suffered, and (4) the damages were a direct result of the harm. Freed v. Geisinger Medical Center, 971 A.2d 1202, 1206 (Pa. 2009).

5. A non-specialist physician is required to treat the patient with the skill and knowledge usually possessed by physicians in the same or a similar locality, giving due regard to the advanced state of the profession at the time of the treatment. Joyce v. Boulevard Physical Therapy & Rehabilitation Center, P.C., 694 A.2d 648, 654 (Pa.Super. 1997).

6. The physician also is required to exercise the care and judgment of a "reasonable man," or under these circumstances, a reasonable person in the place of the physician. Id.

7. There is no evidence in this case that the actions of Dr. Eash-Scott or Dr. Johnsen-Martin fell below the standard of care in their management of Ms. Roman's labor and delivery.

8. With regard to Dr. Eash-Scott, the plaintiffs' medical expert, Dr. Richard Luciani, and defendant's medical expert, Dr. Jay Goldberg, testified that Dr. Eash-Scott's care of Ms. Roman was not negligent, was appropriate, and did not fall below the standard of care.

9. With regard to Dr. Johnsen-Martin, Dr. Luciani and Dr. Goldberg testified that fetal heart tracings are subject to interpretation. The defendant's expert, Dr. Jay Goldberg, testified that he agreed with Dr. Johnsen-Martin's interpretation of the fetal heart tracings, that they were "overall reassuring" throughout Ms. Roman's labor. Dr. Goldberg also testified that a considerable number of recognized and respected obstetricians also would agree, and that Dr. Johnsen-Martin's interpretation of the fetal heart tracings as reassuring is consistent with Bulletin 70 of the American Congress of Obstetricians and Gynecologists. Dr. Johnsen-Martin did not fall below the standard of care by failing to consult an obstetrician and recommend a caesarean section on the basis of the fetal heart tracings. In addition, both Dr. Luciani and Dr. Goldberg testified that the fetal heart tracings did not indicate that the baby suffered hypoxic or acidotic injury during the labor in this case; the injury arose from the shoulder dystocia that occurred during delivery, after the baby's head was delivered and while the baby was still in the birth canal.

10. The shoulder dystocia with a double nuchal cord that occurred during the vaginal delivery is unpredictable, unpreventable, and no doctor can cause a shoulder dystocia or double nuchal cord.

11. There is no evidence that if Dr. Johnsen-Martin had summoned Dr. Weber, the obstetrician on duty that night, at 7:30 p.m. or any time thereafter based upon the fetal heart tracings, Dr. Weber would have elected to perform a caesarean section, or that the patient would have consented to that procedure, thus obviating the possibility of a shoulder dystocia. Dr. Weber was free to choose what course of action he would take, and Dr. Johnsen-Martin had no ability to mandate that Dr. Weber perform a caesarean section.

12. There is no evidence that Dr. Johnsen-Martin's choice to allow labor to continue caused a shoulder dystocia or double nuchal cord, or increased the risk of either, or increased the risk that the shoulder dystocia would last as long as it did.

13. The plaintiffs have failed to prove that an alleged misreading of the fetal heart tracings and election to allow labor to continue without requesting an obstetrical consult and recommending a caesarean section based upon those tracings, caused or increased the risk of an entirely distinct condition, i.e., a double nuchal cord and shoulder dystocia that persisted despite the application of appropriate maneuvers to relieve it.

14. Plaintiffs Yadira Roman and Carlos Ruiz, parents of the infant, allege that they witnessed the defendant's negligence and injury to the infant, and suffered severe emotional shock and trauma and emotional injury. See Compl. Count V. Under Pennsylvania law, the plaintiffs may recover if the defendant breached an implied duty not to inflict foreseeable emotional distress that resulted in damages from the alleged negligent infliction of emotional distress. Toney v. Chester County Hospital, 36 A.2d 83,

99-100 (Pa. 2011).  The plaintiffs must, however, establish both causation and damages.  <u>Id.</u>

15. The plaintiffs are not entitled to emotional distress damages in this case because the defendant did not breach its duty to the plaintiffs.  As explained above, Dr. Johnsen-Martin was not negligent in her care of Yadira Roman.  The injury to the baby and ensuing emotional distress of the parents arose from the double nuchal cord and shoulder dystocia occurring during delivery.  Therefore, the plaintiffs would have suffered emotional distress regardless of the defendant's actions.  In addition, Dr. Eash-Scott and Dr. Johnsen-Martin were especially solicitous of Ms. Roman and Mr. Ruiz, supporting them during the delivery and comforting them after the sad outcome.  There is no evidence that either doctor treated plaintiffs negligently.